## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FAIYAZ ELAHI, | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| | : | |
| NUTMEG STATE FINANCIAL | : | |
| CREDIT UNION | : | |
| | : | |
| Defendant. | : | MAY 17, 2021 |
| | : | |

*(Left margin, vertical text:)* THE McMINN EMPLOYMENT LAW FIRM, LLC  ·  1000 Lafayette Boulevard, Suite 1100 ▪ Bridgeport, CT 06604 ▪ T: (203) 683-6007 ▪ F: (203) 683-9881

### COMPLAINT

### JURISDICTION AND VENUE

1.  This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2; Connecticut General Statues § 46A-60(b)(1), (b)(4); and Connecticut state law.

2.  The jurisdiction of this court is founded upon 28 U.S.C. §1331 (federal question) and the provisions of 28 U.S.C. §1343.

3.  Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §1391(b) in that the claims arose in this district and Plaintiff resides in this district.

4.  Supplemental jurisdiction over Plaintiff's supplemental state law claims are invoked pursuant to 28 U.S.C. §1367 as the claims arise out of the same transaction and occurrences as Plaintiff's federal claims.

5.  Costs, expert witness fees, and attorney's fees are sought pursuant to 42 U.S.C. §1988.

## PLAINTIFF

6.   The Plaintiff, Faiyaz Elahi ("Plaintiff" or " Elahi ") is a natural person and resident of the State of Connecticut.

## DEFENDANT

7.   The Defendant, Nutmeg State Financial Credit Union ("Defendant" or "NSFCU"), is a Connecticut corporation, headquartered in the State of Connecticut, is registered to conduct business in the State of Connecticut, and conducts substantial business at 521 Cromwell Avenue, Rocky Hill, CT, 06067, where Plaintiff was employed.

8.   Defendants employ more than twenty (20) employees.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.   Elahi received a Release of Jurisdiction from the Connecticut Commission on Human Rights and Opportunities on March 5, 2021.

10.  Elahi received a Notice of Right to Sue from the U.S. Equal Employment Opportunity Commission on March 9, 2021.

## FACTUAL ALLEGATIONS

11.  Plaintiff is Indian.

12.  Defendant hired Elahi on March 18, 2020, for the position of Full-Time Director, Financial Institution Operations located in Rocky Hill, Connecticut.

13.  From the onset of his employment, Elahi began to be treated disparately and was treated as the outcast.

14.  For instance, Elahi did not receive an organization wide email welcome from John Holt ("Holt") (non-Indian), CEO, as Greg Angelillo ("Angelillo") (non-Indian)

received and a welcoming lunch invitation the other Directors Craig Ginman ("Ginman") (non-Indian) and John Korber ("Korber") (non-Indian) received.

15. This welcoming lunch could have been hosted when Elahi was onsite just one week later or Elahi could have been permitted to work remotely, an opportunity afforded to the other non-Indian Directors—a sign of disparate treatment later to come.

16. On that point, Elahi felt significant pressure to travel to Connecticut and physically work onsite despite his serious concern per the Center for Disease Control (CDC) guidance that COVID-19 could fatally impact (as can be seen in the current environment) his underlying health condition (Coronary Artery Disease or CAD).

17. Elahi confided with Tricia Callaghan ("Callaghan") (non-Indian) Human Resources ("HR") Consultant that his peer Directors were permitted work from home if they felt uncomfortable and unsafe because of COVID and inquired why he was not permitted to work from his home in California since work was being conducted remotely and through videoconferencing.

18. Nonetheless, Elahi was pressured by both Callaghan and Holt to feel that Nutmeg required him to be present in Connecticut, onsite. Accordingly, during a pandemic, taking a huge health risk, he traveled to Connecticut from California.

19. Angelillo who was hired after Elahi, in comparison, was clearly given special accommodations (while caring for his ill father) to work offsite and he was not present and was frequently late for many meetings without repercussion.  Yet, fraught with anxiety and concern, Elahi, then went to Nutmeg's Connecticut location daily, feeling extremely uncomfortable and pressured to be present during the pandemic, while also already knowing that he has been treated disparately.

-3-

20. Putting his feelings aside in order to support his family, Elahi continued to satisfactorily perform through his mental anguish and anxiety.

21. As evidence of this, around June 30, 2020, he was engaged by the SSC members (Callaghan/Holt/Levesque/Ungerland), and despite performing satisfactorily, was given coaching regarding a couple of performance areas (mostly communication) that he addressed immediately.  Of significant importance, no other corrective action or feedback was given.

22. Following this, the unequal treatment towards Elahi became even more pointed.  Upon his arrival on site on July 13, 2020, Callaghan engaged Elahi in a 90-day review phone conversation the first week he was there, where instead of being given performance feedback, he felt she seemed to be guiding him to agree with her that the role was not a good fit for him.

23. Callaghan stated, "after 90-days this role is probably not for you right." She also stated, "what was I thinking putting together four guys (Directors) with completely different attributes and looks," a brazen comment about Elahi's different ancestral background. This made Elahi feel that he was demographically (race/ancestry) not aligned with the Director group that consisted of three non-Indian Directors.

24. Elahi thereafter began to notice more disparate treatment as compared to his fellow Directors.  In point of fact, on July 22, 2020, Elahi began to be excluded from crucial strategic meetings by Jeff Levesque ("Levesque") (non-Indian), CEO.

25. In stark contrast, John Korber, Director; Greg Angelillo, Director; and Al Festini ("Festini") (non-Indian), (Transformation Executive and former COO), were

all invited to attend in the conference room and Elahi was intentionally not invited even though he was physically present in the building.

26. Perturbed and confused by the situation but professionally poised, Elahi walked in and asked Levesque directly and audibly to all present if this was a closed session and Levesque replied, in a very blunt manner, "yes it is," which was strange as Elahi was a Director as well and should have been included but was not and surprisingly Festini, on the other hand, not a Director, was invited.

27. Accordingly, Elahi complained to Tricia Callaghan, HR Consultant regarding being excluded and treated differently than his fellow Directors. Elahi informed Callaghan that he considered discussing this matter with Levesque directly for clarification; however, after a conversation with fellow Directors Korber, Ginman, and especially Angelillo, who has known Levesque for a long time, Elahi reconsidered and understood that his complaints would be futile and grew concerned of a real threat of retaliation.

**A. Elahi's Fears Come to Fruition, the Retaliation Begins.**

28. In retaliation, for his good-faith complaints of disparate treatment, on July 23, 2020, when Elahi was in the field conducting branch visits, Levesque made a deliberate effort to critique and put Elahi's responses down, while simultaneously praising his Caucasian counterpart, stating that his counterpart had the correct strategic "2.0 strategy" perspective regarding wire transfers and Elahi was completely wrong. This felt very out of place to Elahi since this employee as former COO was the one accountable for placing appropriate controls (exception wires updated in policy, training, communication, approval process) in place to manage risk.

29. If this individual were to have performed his job diligently and managed to risk correctly the transaction of $120K on July 20 would have been avoided and a possible loss not incurred.  In addition to this operations break, for several months this particular employee seems to have misrepresented to the Board in BOD meetings SAR (Suspicious Activity Reports) as being completed when in essence they were not, and this was identified and cited in the most recent regulatory exam.  So, in light of this, for Elahi to hear praise for his Caucasian counterpart and disparaging remarks for himself in the area of operations made him feel retaliated against for complaining against Levesque.

30. Thereafter, on July 27, for the second time in one week, Levesque facilitated another critical strategy meeting on video conference with Korber and Angelillo—once again, Elahi had been intentionally not included, although he was physically present in the building just two offices away.

31. During the same time frame, Elahi completed his branch visits and contacted John Holt, CEO regarding his conversation with Javier Roman, Branch Administrator, and Luis Mejia, DMV Supervisor (both Hispanic).  Elahi expressed his concern that there existed a clear pay disparity for minorities created within the organization by former senior management Festini, Brian Scavone ("Scavone") (Caucasian), and Lisa Asadourian ("Asadourian") (Caucasian) who were approached many times by Roman and Mejia to correct the issue, to no avail.

32. Roman had been promoted to Branch Manager, then Branch Administrator; however, the pay increases warranted with these promotions were not provided and he found himself earning less income than new counterparts or subordinates (Caucasians) whom

he was coaching and leading.  When Elahi insisted to Holt that Nutmeg review the pay disparity of minority employees, he was immediately shut down by Holt, who stated he should not negatively talk about the former senior management and felt the "chill" of retaliation that if he were to pursue this further there could be repercussions.  On the morning of July 28, in the weekly Director/CEO conference Holt indicated that the Directors should be careful with information being given to them and explicitly referred to Elahi's branch conversation with an "individual"—tellingly, one day later Elahi was terminated.

33. Thus, Nutmeg's last salvo occurred on July 29, 2020—Elahi was informed of his termination (effective August 12) under the guise of "performance issues."

**B.  Nutmeg's Pretextual Proffered Reason for Elahi's Termination**

34. When Elahi is compared to his non-Indian co-workers, the pretextual reasons for his termination become clearer. For instance, a Caucasian Director of Financial Planning and Analysis has had poor performance for six months (twice as long as alleged by Elahi), which was frequently questioned and challenged openly by Holt and Levesque, but, in comparison to Elahi he was neither disciplined nor terminated, like Elahi.

35. Even assuming arguendo, that Elahi had actual performance issues, which contrasts the fact that he was strongly regarded and widely respected by many within the organization who actually thought he was the "leader of the Directors." In comparison, Elahi's fellow Caucasian Director had the same purported performance issues that were told to Elahi as the reason for his termination; yet he was given multiple opportunities to correct his performance including an entire re-onboarding and training

opportunity and remains employed by Nutmeg. Elahi, in comparison, was not given this same opportunity.

36. Moreover, another similarly situated employee exposed the organization to all types of operations risks including (verbatim) "the worst audit in the history of the credit union" as indicated by Holt both in writing and in verbal communications—yet, he also was not subjected to the same discipline as Elahi and remains employed.

37. In fact, due to his deficient performance, he was supposed to be eliminated in a layoff by end of 2020 (currently on contract until the end of the year) and in essence replaced by Elahi but was recently positioned back in the executive department seemingly to be retained and Elahi terminated. In fact, this similarly situated Caucasian counterparts performance issues were more substantial to those alleged against Elahi, and aside from the audit, he had repeated operations breaks, including the most recent wire fraud issue, which could have been avoided if he placed appropriate controls following a similar event in 2017 but did not and was neither disciplined nor fired. Instead, he was praised and lifted up at times by both Holt and Levesque as if all concerns had somehow vanished.

38. According to Holt, the entire Directors, Korber, Ginman, and Angelillo (all non-Indian)—came short in a couple of deliverables for the July Board meeting but only Elahi (Indian) was singled out and terminated and all of his counterparts retained their positions.

39. By way of additional comparison, another no-Indian comparator exposed the credit union to $120,000 potential loss in a wire transfer that he per his own admittance did not properly authenticate and approved. However, in discussion regarding this, Elahi

found Holt very protective of this employee and did not want to see him negatively impacted. Holt had prior to this expressed alarm at this employee possibly being a "flight risk" during transformation and wanted Elahi and Callaghan to be proactive in devising a retention plan for him but Roman and Mejia in comparison were not afforded this level of attention nor care when Elahi indicated they might be a "flight risk" given their concerns of pay disparity that were never addressed.

40. In this case, it can be demonstrated that complainant was treated differently from other "similarly situated" Directors.

## COUNT ONE

### RETALIATION,
### IN VIOLATION OF CONN. GEN. STAT. § 31-51q

41. Plaintiff incorporates paragraphs 1-40, with the same force and impact as if fully set forth herein at length.

42. Elahi was exercising his free speech on matters of public concern by raising good-faith concerns over minority disparate treatment with respect to pay rates, exclusion and isolation.

43. Plaintiff's decision to report concerns regarding equality in the workplace was protected activity, provided for and compelled by the state of Connecticut.

44. In retaliation for his good-faith complaints and raising awareness to concerns, Elahi was retaliated against by Nutmeg, including, but not limited to the following:

   a) Terminating Elahi's employment on July 29, 2020 (effective August 12).

45. Elahi's speech is protected by Sections, 3, 4, and 14 of the Connecticut

Constitution.

46.   The exercise of his rights did not materially interfere with his job performance, nor did it interfere with his working relationship with Defendant.

47.   Plaintiff was discharged due to the exercise of his rights guaranteed by the Connecticut Constitution, in violation of Conn. Gen. Stat. § 31-51q.

48.   As a result of his wrongful discharge, Elahi has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

49.   Elahi seeks compensatory and punitive damages for Defendant's misconduct.

## COUNT TWO

### WRONGFUL DISCHARGE IN VIOLATION OF
### AN IMPORTANT PUBLIC POLICY

50.   Plaintiff incorporates paragraphs 1-49, with the same force and impact as if fully set forth herein at length.

51.   Elahi's discharge, as set forth above, violated important public policies in the State of Connecticut, including, but not limited to, public policies with respect to employee's rights, and equality in the workplace.

52.   As a result of his wrongful discharge, Elahi has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

53.   Elahi seeks compensatory and punitive damages for Defendant's misconduct.

## COUNT THREE

### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (INDIAN RACE, ANCESTRY, ETHNICITY, AND NATIONAL ORIGIN DISCRIMINATION)

54. Plaintiff hereby incorporates Paragraphs 1-40 with the same force and impact as if fully set forth herein.

55. Defendant employs more than fifteen employees.

56. Plaintiff was qualified for his position.

57. Plaintiff, of Indian descendent, is in multiple protected classes.

58. Plaintiff was subjected to outward harassment and disparate treatment, by NSFCU upper management, who treated him disparately by, among other things,

   a) Failing to provide him an organization-wide email welcome and welcoming lunch invitation;

   b) Compelling him to travel from California to Connecticut with an underlying serious health condition, during the COVID-19 pandemic;

   c) Despite performing satisfactorily, giving him coaching;

   d) During the 90-day review phone conversation the first week Plaintiff was present in Connecticut,  instead of being given performance feedback, guiding him to agree that the role was not a good fit for him;

   e) Callaghan, HR, stating, "after 90-days this role is probably not for you right."

   f) Callaghan stating, "what was I thinking putting together four guys (Directors) with completely different attributes and looks," a brazen comment about Elahi's different ancestral background;

   g) Being excluded from crucial strategic meetings by Jeff Levesque (non-

-11-

Indian), CEO;

    h)  Making a deliberate effort to critique and put Elahi's responses down, while simultaneously praising his Caucasian counterpart; and

    i)  Undermining and critiquing Elahi and his performance causing humiliation when in fact those to whom he was compared to had work performance deficiencies.

59.    Aside from the outward disparate treatment, the Plaintiff suffered numerous adverse employment actions, including, but not limited to, the following:

    a)  Being terminated from his position on July 29, 2020 (effective August 12).

60.    The above prescribed discriminatory actions were taken against the Plaintiff because he is Indian.

61.    Defendant's conduct is unlawful and in violation of Title VII.

62.    As a result of the Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer damages, including but not limited, to substantial lost wages, fringe benefits, health insurance, retirement and pension benefits, mental and emotional distress, and the ability to enjoy life's pleasures.

63.    Plaintiff seeks damages as a result of Defendant's unlawful conduct.

## COUNT FOUR

### VIOLATION OF THE ADAAA - DISABILITY DISCRIMINATION

64.    Plaintiff hereby incorporates Paragraphs 1-40, with the same force and impact as if

fully set forth herein.

65. Plaintiff suffers from Coronary Artery Disease that placed him at a high risk during the Covid-19 pandemic.

66.  Nutmeg treated Plaintiff in a disparate manner in the terms and conditions of his employment based upon his disability, including, but not limited to the following:

    a) Pressuring him to be present at his office in Connecticut, onsite in the middle of the pandemic when Caucasian peers were allowed to work remotely; and

    b) On July 29, 2020 Plaintiff was informed of his termination effective August 12, 2020.

67. As a result of his wrongful discharge, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

68. Plaintiff seeks compensatory and punitive damages for Defendant's misconduct.

## COUNT FIVE

### VIOLATION OF THE ADAAA - DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE

69. Plaintiff incorporates paragraphs 1-40 and 64-68, with the same force and impact as if fully set forth herein at length.

70. Plaintiff suffers from Coronary Artery Disease.

71. Defendant failed to accommodate the Plaintiff's known disability, by, among other things:

a) Failing to engage in the interactive process, despite knowing or reasonably should have known of Plaintiff's disability;

b) Failing to accommodate Plaintiff's disability after he requested a feasible accommodation; and

c) Terminating Plaintiff's employment on July 29, 2020, effective August 12, 2020.

72. As a result of his wrongful discharge, Plaintiff has suffered and will continue to suffer damages including but not limited to lost wages, fringe benefits, health insurance, emotional and psychological distress, stress, anxiety, and loss of the ability to enjoy life's pleasures and activities.

73. Plaintiff seeks compensatory and punitive damages for Defendant's misconduct.

**COUNT SIX**

**RETALIATION,
IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

74. Plaintiff incorporates paragraphs 1-40 with the same force and impact as if fully set forth herein at length.

75. Plaintiff engaged in protected opposition to discrimination by complaining of disparate treatment of himself and others, by among other things:

a) Complaining to Tricia Callaghan HR, that his peer Directors were permitted work from home if they felt uncomfortable and unsafe because of COVID and that he was not;

b) Questioning Levesque's closed session meetings in which the Plaintiff was not invited, but his Caucasian counterparts were;

-14-

c) Complaining to Callaghan, HR, regarding being excluded and treated differently than his fellow Directors; and

d) Expressing his concern that there existed a clear pay disparity for minorities created within the organization.

76. Subsequent to his engagement in a protected activity, Plaintiff suffered multiple retaliatory employment actions, including, but not limited to:

a) On July 23, 2020, when Elahi was in the field conducting branch visits, Levesque made a deliberate effort to critique and put Elahi's responses down, while simultaneously praising his Caucasian counterpart;

b) On July 27, for the second time in one week, Levesque facilitated another critical strategy meeting on video conference and Elahi had been intentionally not included, although he was physically present in the building just two offices away;

c) When Elahi insisted to Holt that Nutmeg review the pay disparity of minority employees, he was immediately shut down by Holt, who stated he should not negatively talk about the former senior management and felt the "chill" of retaliation that if he were to pursue this further there could be repercussions;

d) On the morning of July 28, 2020 in the weekly Director/CEO conference Holt indicated that the Directors should be careful with information being given to them and explicitly referred to Elahi's branch conversation with an "individual"; and

e) On July 29, 2020—Elahi was informed of his termination (effective August 12) under the guise of "performance issues."

77. The adverse employment actions to which Plaintiff was subjected were motivated by retaliation for Plaintiff's opposition to unlawful discrimination and disparate treatment.

78. The Defendant's actions violate Title VII.

79. As a result of the foregoing conduct, Plaintiff has suffered and will continue to suffer damages that include, but are not limited to: lost or reduced wages, fringe benefits, health insurance benefits, and pension payments; emotional and psychological distress, stress, anxiety; physical injury; and the loss of the ability to enjoy life's pleasures and activities.

80. Plaintiff is seeking damages as a result of Defendant's unlawful conduct.

**PRAYER FOR RELIEF**

Wherefore the Plaintiff prays that this court award:

1. Money damages;

2. Costs;

3. Punitive damages, attorney fees, and expert witness fees;

4. Pre-judgment interest

5. Trial by jury; and

6. Such other relief as the Court deems just, fair, and equitable.

-16-

THE PLAINTIFF,
FAIYAZ ELAHI


By: _____/s/_____
      Michael C. McMinn (ct267169)
      **THE MCMINN EMPLOYMENT**
      **LAW FIRM, LLC**
      1000 Lafayette Blvd., Suite 1100
      Bridgeport, CT 06604
      Tel: (203) 683-6007
      Fax: (203) 680-9881
      michael@mcminnemploymentlaw.com

      *COUNSEL FOR PLAINTIFF*